TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






NO. 03-02-00417-CR






Natalio Chaparro, Appellant



v.



The State of Texas, Appellee







FROM THE DISTRICT COURT OF TRAVIS COUNTY, 331ST JUDICIAL DISTRICT

NO. 1011635, HONORABLE BOB PERKINS, JUDGE PRESIDING






M E M O R A N D U M O P I N I O N



 Appellant Natalio Chaparro was charged with aggravated sexual assault of an elderly
person. See Tex. Pen. Code Ann. § 22.021(a)(1)(A)(i), (2)(C) (West 2003). Following a trial to the
court, the court found Chaparro guilty of the offense and sentenced him to thirty years in the Texas
Department of Criminal Justice Institutional Division. By four issues, Chaparro appeals his
conviction. We will overrule those issues and affirm the conviction.


DISCUSSION

Sufficiency of the Evidence

 By his second issue, Chaparro challenges the factual sufficiency of the evidence to
support his conviction. In determining the factual sufficiency of the elements of an offense, the
reviewing court views all of the evidence in a neutral light. Johnson v. State, 23 S.W.3d 1, 6-7 (Tex.
Crim. App. 2000). The court reviews the evidence weighed by the fact finder that tends to prove the
existence of the elemental fact in dispute and compares it with the evidence that tends to disprove
that fact. Id. at 7. In conducting its factual sufficiency review, an appellate court reviews the fact
finder's weighing of the evidence and is authorized to disagree with the fact finder's determination. 
Clewis v. State, 922 S.W.2d 126, 133 (Tex. Crim. App. 1996). The reviewing court, however, does
not substitute its judgment for that of the fact finder and should set aside the verdict only if the
evidence is so weak as to be clearly wrong or manifestly unjust or if the finding of a vital fact is so
contrary to the great weight and preponderance of the evidence as to be clearly wrong. Zuliani v.
State, 97 S.W.3d 589, 593 (Tex. Crim. App. 2003); Johnson, 23 S.W.3d at 11; Cain v. State, 958
S.W.2d 404, 407 (Tex. Crim. App. 1997). 

 Travis County Sheriff's Deputy Santiago Salazar testified that on November 3, 2000,
he was patrolling southeastern Travis County with his partner Deputy Gray, though they were in
separate vehicles. Deputy Gray received a dispatch at about 1:00 p.m. In response to the dispatch,
the two deputies drove to a house in Del Valle, where they encountered Hermilio Benitez, Jr., a
young Hispanic male, and his father Hermilio Benitiz, Sr. Salazar described the elder Benitez as an
older gentleman, who was about 5'1" or 5'2" and about 120 pounds; he spoke only Spanish. Benitez
was hunched over when Salazar observed him, and was making moaning sounds and saying, "ay,"
which Salazar understood as the Spanish expression for "ouch." It was obvious to Salazar that
Benitez was in pain and distraught. 

 When Salazar questioned Benitez, he responded in Spanish that he had been violated. 
He explained that Chaparro had come to his house the night before to talk about a car deal. The two
men eventually left Benitez's house to buy a car battery. They were out drinking, although Benitez
did not specify where, and at about midnight ended up at Chaparro's house. Benitez told Salazar that
Chaparro then punched him, knocking him to the ground, stripped him of his pants, and penetrated
his anus with his penis. Afterwards, Chaparro drove Benitez home. Benitez told Salazar that he was
in pain, had no control retaining his feces, and could not stop soiling himself. Salazar observed that
Benitez had some redness on his forehead and a dry speckle of blood near his lip and noticed a strong
odor of feces about him. As requested, Benitez provided Gray the clothes he was wearing when he
was assaulted and the clothes that he wore after he had cleaned himself up. The first set of clothes
were soiled with feces and blood, and the second set were soiled only with feces. Deputy Gray
transported Benitez to St. David's hospital for a rape examination. 

 Travis County Sheriff's Detective Chris Orton testified that after reading Salazar's
and Gray's reports, he contacted Sergeant Mancias to assist him in obtaining a statement from
Benitez. On November 8, Benitez and his son met with Orton and Mancias at Orton's office. 
During questioning, Benitez's eyes swelled up and watered, and it was obvious that Benitez was still
experiencing physical pain, as he had trouble sitting still and shifted from side to side in his chair. 
Orton also observed dried blood "like a scab" by one of Benitez's eyes and some bruising on his
knees, which Orton had photographed. It was obvious to Orton that Benitez was also still having
trouble controlling his bowel movements. Orton learned during the interview that Benitez was born
in 1931 and was over the age of 65 when the assault occurred. 

 On November 15, Orton drove to Chaparro's home, which was described as the place
where the assault occurred. There he encountered Mario Bolanos. Orton questioned Bolanos about
the night of November 2, and Bolanos's account corroborated Benitez's report. Orton then obtained
an arrest warrant and arrested Chaparro on November 16. 

 On November 17, Orton visited Chaparro at the jail to serve him with a search
warrant for DNA samples (from hair, blood, and saliva), which he obtained. He returned on
November 27 to speak with Chaparro. After receiving a written copy of his Miranda rights and
having them read to him, Chaparro waived his rights and made a statement. In his statement,
Chaparro claimed that sometime in early November, he went to Benitez's house to pick up a car title
that Benitez owed him. Chaparro drove Benitez back to his own house to pick up $250, which he
owed Benitez for the car. After he paid Benitez, Benitez refused to give Chaparro the title, and the
two men began drinking. Afterwards they drove to Chaparro's friend's house; others accompanied
the men, including Bolanos. They then returned to Chaparro's house, where they ate shrimp and
drank more alcohol. Sometime between 10:30 p.m. and midnight, Chaparro's wife, who had also
been at the house, left for work, and Benitez asked to be taken home. Chaparro refused because he
was drunk and because the weather was nasty. Eventually, Chaparro agreed to take Benitez home,
but he ran out of gas on the way. "One of the boys" went to a gas station, where Chaparro's wife
worked, and brought back some gas. Chaparro decided to return to his house because it was
storming. Once at the house, Bolanos and the other boys went to their rooms (they were renting from
Chaparro), and Chaparro retreated to his bed. All of a sudden Benitez got on his back and acted as
if he was going to put his penis in Chaparro's butt. Chaparro pushed him off and onto the floor. 
Benitez returned to Chaparro and unbuckled Chaparro's pants and started playing with his penis;
Benitez tried to kiss him and to suck his penis. Benitez then rolled over and lifted his butt. Chaparro
was "not sure if [he] penetrated him or not. It seems like my penis may have just been between his
legs. I came, but I'm not sure if it was in him or not." Afterwards, Chaparro drove Benitez home.

 Sergeant Manual Mancias, Jr. with the Travis County Sheriff's office testified next. 
On November 8, Mancias assisted Orton in obtaining a statement from Benitez by translating for
him. Mancias testified that he noticed physical injuries on Benitez. He also said that while giving
his statement, Benitez became teary-eyed, angry, and embarrassed. Benitez told Mancias that he was
still experiencing pain that day. 

 Mancias later went with Orton to Chaparro's residence, where he came into contact
with a man he remembered as Mario. Mancias questioned Mario about the night of November 2,
2000, the night that the assault occurred. Mario's responses corroborated some of what Benitez had
told the officers. 

 The complaining witness, Benitez, testified through the use of an interpreter. Benitez
said he had known Chaparro for a few years before the assault occurred; they had once lived near
each other. The afternoon of November 2, Chaparro went to Benitez's house at about 3:00 p.m. 
Chaparro had performed some mechanical work on Benitez's truck, and Benitez had complained to
Chaparro about the quality of the work. Chaparro told Benitez that he needed a new battery; so the
two men, along with a third man that Benitez remembered as Mario, left Benitez's house in
Chaparro's car to buy a battery. Despite Benitez's requests to return to his house, Chaparro instead
went to a store, bought a bottle of liquor, and started drinking. The men then went to the home of
friends of Chaparro's, where Chaparro continued to drink and smoked marihuana; they stayed there
for about two hours. Benitez thought he may have had two or three small glasses of liquor as well. 
 After Benitez and Chaparro left the friends' house, Chaparro continued to ignore
Benitez's requests to return home, and instead the men went to Chaparro's house; it was almost 2:00
a.m. by then. Once inside, Chaparro went to his bed, and Benitez laid on the floor in the bedroom;
Mario was in another room. Then Chaparro got out of bed, went to Benitez, put his hand over
Benitez's mouth, and started taking off Benitez's underwear. The two men started struggling,
Chaparro shoved Benitez, and Benitez fell and hit himself. Chaparro put his penis in Benitez's anus,
causing him a lot of pain and bleeding. Later that morning, Chaparro returned Benitez to his home. 
Once home, Benitez called his son to report what had happened to him. His son in turn called the
police. Benitez said he had to wear diapers for over a month after the assault occurred because he
could not control his bowel movements, and at the time of trial, was still experiencing pain. 

 Benitez's son, Jr., (1) also testified. Benitez called his son after he returned home the
morning of November 3 and explained what had happened to him; Jr. immediately went to his
father's house. When Jr. arrived, Benitez was crying and appeared to be in a lot of pain; he could
barely walk. After hearing Benitez explain that Chaparro assaulted him, Jr. called the police. He
said that it took two or three months before his father recovered from his injuries. 

 On cross-examination, Jr. admitted that he initially told Deputy Gray that he
understood that his father "went with a friend [Chaparro] to his friend's house and got drunk of
alcohol and smelled marijuana." He also testified that by the time he arrived at his father's house,
his father had been drinking beer. 

 Janet Difranco is the sexual assault nurse examiner (SANE) who examined Benitez
at St. David's hospital on November 3. Deputy Salazar translated for Difranco and Benitez. 
Difranco testified that Benitez, through Deputy Salazar, told her he had been punched on his face
and then sexually assaulted. He further stated that he had already wiped his genital area, had already
urinated, had a bowel movement, vomited, and had changed his clothes since the assault. She
described Benitez's injuries as an abrasion to his left chin area, scabs around his eyes (which may
have been old), scratches on his inner right thigh, and a red area with tenderness on his inner left
thigh. 

 Difranco performed a detailed anal/genital exam and observed severe injuries: several
areas of lacerations around the anus and two abrasions on either side of the anus, one of which was
bleeding. Because Benitez complained that he had been bleeding, Difranco summoned a physician
and together, they performed an internal exam of Benitez's rectum, where they discovered a "pretty
large laceration internally of his rectum," which was bleeding. Difranco testified that she had not
seen injuries that serious to an anal cavity in any of the SANE exams that she had performed, and
she had performed about 110 SANE exams. The injuries were consistent with Benitez's description
of the assault. Difranco opined that the injuries could "possibly" result in a loss of bowel
movements. The physician who assisted her suggested that Benitez's treatment might require a
surgical component. As part of her exam, Difranco collected Benitez's underwear, which had stool
and blood in the crotch area. 

 After the State rested its case, the defense recalled Benitez to testify. He denied
having had any alcoholic beverages after he got home the morning of November 3. 

 Wilson Young, a DNA analyst with the Texas Department of Public Safety, testified
that he performed DNA analyses on semen samples obtained during Benitez's SANE exam. 
Following his analysis, Young was unable to determine a DNA profile from the individual that
contributed the semen that was obtained during the SANE exam. On cross-examination, Young
explained that an insufficient number of spermatozoa were present to be able to determine from
whom the semen may have originated. He agreed that if a victim has washed his anal cavity after
a sexual assault, that can affect how much spermatozoa is present. 

 Kathleen Benitez, Chaparro's wife, testified that she was at home the night of
November 2. Chaparro arrived at about 10:30 that night with Benitez, Mario Ramirez, and Mario's
three brothers. All but one were "plastered." They had been at a friend's house since about 8:00 or
9:00 that night. The men continued drinking when they returned to Chaparro's house, and Kathleen
made shrimp cocktails for them. Benitez communicated that he wanted to go home, but Chaparro
would not take him because it was raining and he was too drunk to drive. Kathleen left for work at
a nearby convenience store at about 10:45. While at work, one of the men who had been with
Chaparro went to the store to collect some gas because Chaparro had run out while driving. 
Chaparro and the young man went back to the store before returning to Chaparro's home. There,
Chaparro called Kathleen, and told her he was going to take Benitez back home. He stopped at the
store again on the way, and Kathleen saw Benitez in Chaparro's truck. The other men were also
present, and everyone appeared to be okay. This was at about 2:45 a.m. When Kathleen returned
home later that morning (about 9:00), Benitez was not present. 

 On cross-examination, Kathleen testified that Chaparro told her that Benitez had
fondled him the night of November 2, but he did not remember having sex with him. Chaparro told
her that while he was sleeping, Benitez, who had been lying on the floor in front of Chaparro, had
unbuckled Chaparro's pants, pulled them down, and was "playing with him." Chaparro told
Kathleen that he knew he had touched Benitez, but he did not know if he had done anything else with
him. 

 Chaparro testified in his defense; his testimony was consistent with his wife's and his
previous statement to the police. He said he first went to Benitez's house at 6:00 p.m. on November
2 to obtain the title to a car he intended to buy from Benitez. Benitez told Chaparro he would give
him the title to the car as soon as Chaparro paid an additional $250. Chaparro agreed and asked
Benitez to accompany him back to his house to pick up the money. Chaparro planned to first stop
and visit some friends and family. At Chaparro's house, the men were accompanied by at least four
other men. They drank beer there, ate shrimp cocktail, and Chaparro played guitar for everyone. 
Kathleen had been there as well, but left just before 11:00. At 1:00 a.m., the six men left to take
Benitez home. The truck, however, ran out of gas, and one of the men went to the convenience store
where Kathleen worked to pick up some gas. They then returned to the convenience store, where
they noticed a storm approaching. Chaparro suggested, and Benitez agreed, that they should wait
until the storm ended before attempting to drive to Benitez's house. So, they returned to Chaparro's
home. Once there, the men continued drinking until about 3:00 a.m., when Chaparro went to sleep. 
Benitez continued drinking all night long. At some point while Chaparro was asleep, he felt
someone poking at him. When he looked up, he saw Benitez with his penis outside of his pants. 
Chaparro tried going back to sleep after telling Benitez to do the same. But Chaparro again awoke
to find Benitez on top of him, touching Chaparro's penis. Benitez's pants were pulled down and his
penis was outside of his pants. As Chaparro tried to push Benitez aside, his blue jeans fell down and
he ejaculated and got his semen on Benitez's leg and clothing. He stated that he did not penetrate
Benitez. Afterwards, Benitez began drinking again. Chaparro cleaned himself up and took Benitez
home. 

 In sum, Benitez and Chaparro provided conflicting accounts about what happened
the night of November 2, 2000. The extent of Benitez's injuries as described by Difranco
corroborated Benitez's version of events. The trial court as fact finder was the exclusive judge of
the weight to be given the testimony and the credibility of the witnesses. See Tex. Code Crim. Proc.
Ann. art. 38.04 (West 1979); Alvarado v. State, 912 S.W.2d 199, 207 (Tex. Crim. App. 1995). The
trial court was free to reject or accept any or all of the evidence presented by either party. Saxton v.
State, 804 S.W.2d 910, 914 (Tex. Crim. App. 1991). Viewing the evidence in a neutral light, we
cannot say that the evidence is so weak as to be clearly wrong or manifestly unjust or that the finding
of a vital fact is so contrary to the great weight and preponderance of the evidence as to be clearly
wrong. We overrule Chaparro's second issue.

 By his first issue, Chaparro challenges the legal sufficiency of the evidence to support
his conviction. Under a legal sufficiency review, we view the evidence in the light most favorable
to the verdict and determine whether any rational trier of fact could have found the essential elements
of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319 (1979); Staley v.
State, 887 S.W.2d 885, 888 (Tex. Crim. App. 1994). Any inconsistencies in the evidence should be
resolved in favor of the verdict. Moreno v. State, 755 S.W.2d 866, 867 (Tex. Crim. App. 1988). The
sufficiency of the evidence is determined from the cumulative effect of all the evidence; each fact
in isolation need not establish the guilt of the accused. Alexander v. State, 740 S.W.2d 749, 758
(Tex. Crim. App. 1987). 

 Chaparro argues on appeal that the evidence is legally insufficient to support his
conviction because even though Benitez identified Chaparro as the person who assaulted him, the
DNA lab report exonerates him. The lab report states in pertinent part: "The DNA profile of the
sperm cell fraction of the anal swab is not consistent with the DNA profile of suspect, [Chaparro]. 
[Chaparro] is excluded as a contributor to the anal swab." The DNA analyst, Wilson Young,
testified at the trial, however, that he was unable to determine a DNA profile from the individual that
contributed the semen, explaining that an insufficient number of spermatozoa were present to be able
to determine from whom the semen may have originated. Chaparro relies on Roberson v. State, 16
S.W.3d 156 (Tex. App.--Austin 2000, pet. ref'd), in support of his argument that "[i]f DNA is
legally sufficient, alone, to establish guilt, it ought to be legally sufficient, alone to establish
innocence." 

 Chaparro correctly characterizes the issue in Roberson as whether DNA evidence
alone is legally sufficient to establish the identity of the perpetrator of the crime. Here, however, we
are not presented with only DNA evidence to establish the identity of the perpetrator. Instead, the
court had before it evidence in the form of the lab report, Young's testimony, and Benitez's
eyewitness testimony. Although the lab report weighed in favor of Chaparro's innocence, the results
included in that report were contradicted by Young, thus producing two conflicting forms of
evidence as to whether Chaparro could be excluded as the contributor of the semen. The trial court
also had before it the uncontradicted, eyewitness testimony of Benitez. In addition, Chaparro
acknowledged that he was with Benitez the night of the assault. His identity was not at issue during
the trial. Rather, his defense was that Benitez initiated and consented to the sexual encounter. 

 Young's and Benitez's credibility and the weight to be given the lab report were
issues for the fact finder, which had the responsibility of weighing all the evidence, resolving
evidentiary conflicts, and drawing reasonable conclusions from the evidence. Garcia v. State, 57
S.W.3d 436, 441 (Tex. Crim. App. 2001). The fact finder may believe a witness even though some
of the witness's testimony may conflict with other evidence in the record. Sharp v. State, 707
S.W.2d 611, 614 (Tex. Crim. App. 1986). The fact finder was free to believe Benitez's and Young's
testimony at trial even though it was not confirmed by the lab report. Any contradiction went only
to the weight of the evidence. Thus, the trial court did not err in considering evidence other than the
lab report to determine that Chaparro was the person who assaulted Benitez. We conclude that the
evidence was legally sufficient to support the conviction and overrule Chaparro's first issue.


Motion for New Trial

 By his third issue, Chaparro complains that the trial court erred by overruling his
motion for new trial based on newly discovered psychiatric evidence that might have led to a verdict
of not guilty by reason of insanity. Article 40.001 of the code of criminal procedure provides that
a new trial shall be granted "where material evidence favorable to the accused has been discovered
since trial." Tex. Code Crim. Proc. Ann. art. 40.001 (West Supp. 2003). We employ a four-part test
to determine whether a new trial should have been granted under this provision:



 the newly discovered evidence was unknown or unavailable to the movant at the
time of his trial;

 the movant's failure to discover or obtain the evidence was not due to a lack of
diligence;

 the new evidence is admissible and is not merely cumulative, corroborative,
collateral, or impeaching; and,

 the new evidence is probably true and will probably bring about a different result
on another trial.




Keeter v. State, 74 S.W.3d 31, 36-37 (Tex. Crim. App. 2002) (footnote omitted). The trial court has
discretion to decide whether to grant a new trial based on newly discovered evidence, and we will
not disturb that decision absent an abuse of discretion. Id. at 37. 

 The "newly discovered" evidence that Chaparro urges entitled him to a new trial is
a psychiatric report prepared after trial by Dr. Cantu. Chaparro argues that the report suggests he has
a mental illness; he insists that had he discovered the report before, he would have asserted the
defense of not guilty by reason of insanity. The psychiatric report states that the examining doctor,
Dr. Cantu, found that Chaparro presently suffers from an active and serious mental illness, possibly
delusional disorder, major depressive disorder with psychotic features, or an organic psychotic
(delusional) disorder. He further found Chaparro competent to stand trial, (2) but he had "serious and
active concerns" about Chaparro's "ability to conform his behavior to expected societal/legal norms
because his mental illness substantially impairs his thought, perception of reality, emotional process,
and judgment." 

 The defense of insanity requires that a defendant prove that as a result of a severe
mental disease or defect, at the time of the commission of the offense, he did not know that his
conduct was wrong. Tex. Pen. Code Ann. § 8.01(a) (West 2003). The psychiatric report to which
Chaparro refers includes nothing that suggests he may have suffered from a mental disorder at the
time he committed the sexual assault. As the State points out, Dr. Cantu did not address whether
Chaparro knew right from wrong at the time of the assault. The assault occurred about a year and
a half before Chaparro was examined by Dr. Cantu. Indeed, Chaparro's trial counsel, Joe Taylor,
testified that at the outset of his interactions with Chaparro, Taylor had no reason to suspect that
Chaparro might have been insane at the time of the assault. Thus, we cannot say that the newly
discovered evidence would have probably resulted in a different outcome in another trial and the trial
court abused its discretion in refusing to grant a new trial based on this evidence. Chaparro's third
issue is overruled.

 By his fourth issue, Chaparro complains that the trial court erred in sustaining an
objection to medical evidence testimony during the motion for new trial hearing. During the hearing,
Chaparro's trial counsel, Taylor, was asked if Dr. Cantu, the examining doctor, made any
observations about Chaparro to Taylor. The State objected based on hearsay. Chaparro then offered
Dr. Cantu's psychiatric report into evidence. The trial court did not state whether it was admitting
the report into evidence, but did sustain the State's hearsay objection. Chaparro argues that he
should have been allowed to question Taylor about Dr. Cantu's remarks regarding Chaparro. 
Chaparro, however, did not file a bill of exception; thus, he has failed to preserve error, as we are
unable to determine the content of the testimony that was withheld from the hearing. See Tex. R.
App. P. 33.2. 

 In any event, it is clear that the trial court considered Dr. Cantu's psychiatric report
in deciding to overrule the motion for new trial. The trial court explained: "But even after trial, a
different doctor looked at the defendant and said he was competent to stand trial, so I don't have any
question about that. . . . I don't think that even Dr. Cantu indicated that the defendant was insane --
or -- insane at any time; he just said he had mental health problems." Thus, if there were any error
in refusing to allow Taylor's testimony regarding Dr. Cantu's observations, the error was harmless,
as Dr. Cantu's observations were printed in his psychiatric report, which the trial court clearly
considered. Chaparro's fourth issue is overruled.


CONCLUSION

 Having overruled all of Chaparro's issues, we affirm his conviction.



 __________________________________________

 W. Kenneth Law, Chief Justice

Before Chief Justice Law, Justices B. A. Smith and Puryear

Affirmed

Filed: September 25, 2003

Do Not Publish
1. We refer to Hermilio Benitez, Jr. as "Jr." throughout this opinion only to distinguish him
from his father, Hermilio Benitez, Sr.
2. Before the trial, Chaparro had been examined by another doctor, Dr. Coon, who also
determined that Chaparro was competent to stand trial. Dr. Coon made no comments about a mental
disorder. Chaparro was charged with driving while intoxicated after he had been arrested for
sexually assaulting Benitez. Chaparro's trial counsel, Joe Taylor, requested another psychiatric
examination to determine whether Chaparro was competent to stand trial for the driving while
intoxicated offense. Dr. Cantu examined Chaparro and prepared his psychiatric report after the trial
on the sexual assault charge.